IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DAYTRA LASHAWN KING                                                              PLAINTIFF

                    v.                        Civil No. 14-5083

SERGEANT ARNOLD; SERGEANT
WHITTINGTON; LIEUTENANT CAMBRON;
CORPORAL JENNINGS; WASHINGTON
COUNTY, ARKANSAS; SHERIFF TIM
HELDER                                                                          DEFENDANTS


## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff, Daytra Lashawn King, pursuant to 42

U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*.

Plaintiff is incarcerated in the Washington County Detention Center (WCDC) in

Fayetteville, Arkansas.  Plaintiff maintains her constitutional rights were violated in the

following ways:  (1) she is being subjected to unconstitutional conditions of confinement; (2)

Defendants used racial slurs and failed to protect her from harassment and threats of physical

harm from other inmates; (3) Sergeant Whittington used excessive force against her; (4)

Defendants have retaliated against her; (5) the grievance procedure was inadequate; and (6) she

was discriminated against.  She names as Defendants, Washington County, Sheriff Helder,

Sergeant Arnold, Sergeant Whittington, Lieutenant Cambron, and Corporal Jennings.  All

Defendants with the exception of Washington County, are sued in both their individual and

official capacities.

-1-

AO72A
(Rev. 8/82)

Defendants have filed a motion for summary judgment (Doc. 29).  On December 22, 2014, a Rule 16(b) hearing was held by telephone. Fed. R. Civ. P. 16(b).  Defendants agreed to provide some additional documents prior to the summary judgment hearing.  On January 6, 2015, a hearing was held to allow the Plaintiff to orally respond to the Defendants' summary judgment motion.  The motion is now before me for issuance of this report and recommendation.

**1.  Plaintiff's Testimony**

Plaintiff testified she has been incarcerated in the WCDC since September 30, 2013.  She was in pretrial status until November 6, 2014.  She was in pretrial status during the time the claims at issue in this case arose.

***The Mold***

Plaintiff's first claim concerns mold in the shower drains in Y-pod, a women's pretrial pod.  She testified the mold in the showers was "unbelievable."  She said the mold was in the whole shower area.  She testified that the stall with the handicap seat had mold all over it. Plaintiff indicated that she is allergic to mold and put this on the intake forms.  She testified that the mold caused her to have respiratory problems.

Plaintiff stated she had to clean the shower twice a week until November 6, 2014, when she changed to convicted status.  At that time, she was moved to another pod.  Inmates were not assigned specific cleaning duties.  Plaintiff testified there were four or five women and if she could beat the others to the cleaning supplies, she could have performed a different cleaning job.

She testified they did not have the right cleaning supplies.  She said they would scrub and it would seem like they got the mold cleaned off, but the next day it would be back.  She testified that Corporal Donahue put some drain cleaner down the drains.

According to Plaintiff, her bunk was next to the shower--less than three feet from it.  She testified that the steam made her allergies worse.  Her allergies caused her to cough, sneeze, have red eyes, and every now and then a bloody nose.  The allergy medication she was given on a daily basis helped a little.

Plaintiff believes that Sheriff Helder should be held liable for the unsanitary condition of the showers.  She testified that he was the person who had the last say with regard to supplies.  She indicated she was not sure if he was aware of the problem with the mold.  While she asked to speak with him, she testified she did not get that opportunity.  Plaintiff testified she asked several times to go up the chain of command regarding this issue.

Plaintiff testified she submitted a grievance about the mold in November of 2013, in which she said that the mold infestation and her exposure to it was starting to affect her physically.  In response, she states she was told that a call was put into maintenance.  Plaintiff testified that nothing was done.

However, none of the requests/grievances submitted to the Court with dates in November of 2013 mention a mold problem.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) E at 11.  The first request/grievance that mentions mold is one submitted on April 15, 2014.  On that date, Plaintiff submitted the following request: "Can I have something for my allergies?  They're getting bad at night.  I wake up every night for the past week, choking cause of the dust and mold in the showers."  *Defts' Ex.* E at 38.  In response, she was added to the nurse call.  *Id.*

AO72A
(Rev. 8/82)

On June 4, 2014, Plaintiff again mentioned mold in a grievance she submitted. *Defts'*
*Ex.* E at 42. She stated the pod was already "nasty and dirty in here from mold and allergies."
*Id.*

### Fire Alarms

Plaintiff's second claim is that the Defendants failed to bring the jail up to code.
Specifically, she testified she was addressing the smoke and fire alarms.

Plaintiff testified that the fire alarms in Y-pod were constantly going off. The alarms
would sound for five to ten minutes. According to Plaintiff, they were all false alarms. She
testified the false alarms occurred randomly two or three times a week about every other week.

Plaintiff testified she complained about it to the guards. She indicated she has Post
Traumatic Stress Disorder (PTSD) and that the alarms would upset her and make her feel like
she needed to get out. Plaintiff testified that she had a friend who had a seizure almost every
time the alarms went off. Plaintiff testified that prior to being in the WCDC, she did not require
medication for her PTSD. Plaintiff testified that she now takes medication twice a day for the
PTSD.

Plaintiff testified that she believed Sheriff Helder should be held liable for failing to
bring the fire alarms up to code. She did not believe he had personal knowledge of the problems
with the alarms; but, she knew the captain or whoever the Sheriff left in charge of the jail had
knowledge of the problems.

### Pest Control

Plaintiff testified that there was a problem with roaches. She submitted a
request/grievance regarding this problem on June 4, 2014. *Defts' Ex.* E at 42. In the June 4th

grievance, Plaintiff states: "[I'm] so tired of waking up to find roaches all over. This place needs to be sprayed for pests. This is unsanitary to force us to stay in an infested pod. Cockroaches carry diseases and its already nasty and dirty in here from mold and allergies." *Id*. Plaintiff testified the roaches would crawl on her making her more prone to get sick and also bothered her allergies. Plaintiff testified that she was told that maintenance would come, but nothing was done about this problem, unless someone came to spray without her knowledge while she was out of the detention center for court.

Defendants' Exhibit 1 is an agreement between Washington County and Rid-a-Pest entered into in April of 2013. The jail was to be serviced on a monthly basis. *Defts' Ex.* 1 at 3. Also attached are service logs indicating the jail was serviced on the following dates in 2013: January 29th; February 19th; March 28th; April 29th; May 30th; June 28th; August 30th; and October 23rd. *Id.* at 5-18.

Defendants have also provided information regarding a pest control contract entered into between Washington County and Presto-X in February of 2014. *Defts' Ex.* 2. The contract called for monthly interior and exterior insect management for the jail for the months of April to September. *Id.* at 8. The service log shows pest elimination services were provided at the jail from July 25, 2013, through December 18, 2014. *Id.* at 11. The log shows a "call out" to the jail facility on June 4, 2014, and a regular servicing on June 19th. *Id.* Defendants' records indicate Presto X actually came out to the jail on June 5th and sprayed. *Defts' Ex.* 3.

Plaintiff testified that if Presto employees came to spray, they did not come into the pod and must have just sprayed the hallway. According to Plaintiff, when someone came into the

pod, the inmates were either confined to their bunks or put in the hallway. She testified this did not occur on June 5th.

Plaintiff testified that she believed Sheriff Helder should be held liable for failing to control the pests. She did not know if Sheriff Helder had personal knowledge of the problems with the roaches but she said he was in the chain of command so whoever was left in charge should have let him know.

### *Exposure to Infectious Disease*

Plaintiff testified that there was an inmate, Mindy Drummond, in Y-pod who had a mental disability and had AIDS. Plaintiff indicated that Drummond did not know how to take care of herself and was leaving blood, from having her menstrual cycle, in the shower and on the toilets. Plaintiff did not believe Drummond was intentionally exposing other inmates to the AIDS virus, but instead was not in her right mind.

On August 8, 2014, Plaintiff submitted the following grievance:

> [I'm] requesting that you move Mindy Drummond to another area of this facility. She is on her cycle and leaving blood in the shower areas, in the bunk areas and on the toilets. I know for a fact that she has AIDS. You are endangering our safety keeping her in here around females that have open wounds. I will document this incident.

*Defts' Ex.* F at 10. In response, Sergeant James Morse told Plaintiff to "[l]et a floor deputy know the situation so they could help with this matter." *Id.*

Plaintiff testified that after the first grievance, Drummond was moved to a single cell. After three or four weeks, Drummond was put back into Y-pod. Plaintiff indicated that Drummond started her cycle within a few days of returning to the pod and once again left blood everywhere on the seats, the table, the toilet seat, and in the shower. Drummond would not wear

the sanitary pads.  Plaintiff testified that when they asked to clean up, they were given a spray

bottle and rags.  The inmates did not have any gloves and had to clean up after Drummond and

wash her clothes by hand.

On September 23, 2014, Plaintiff submitted the following grievance:

> I along with the rest of the pod need to speak with whatever sgt. or lt. thats [sic]
> on duty today.  We feel you are endangering our health by continuously allowing
> a woman that has HIV, is on her cycle and constantly has her hands in her
> vaginal area.  We are requesting that Mindy Drummond be moved or you supply
> us with sanitary supplies left in this pod until Mindy is off her cycle.  The
> majority of the [inmates] are requesting her removal from the pod.  Can you
> please address this issue promptly seeing as she has been doing this for 2 days
> now.  It is not our job to bathe her, get her dressed, or clean up after her.  We
> have done this for 2 days now.  It's stressing most out and aggravating the others.

*Defts' Ex.* F at 13.  In response, Sergeant Rebecca Williams told Plaintiff that she did not have

a problem with leaving extra sanitary supplies in the pod until Drummond was off her cycle.

*Id.*  Plaintiff was informed that she could not catch HIV through a bathroom toilet.  *Id.*  Williams

said that no one was being moved.  *Id.*

Plaintiff testified that while she was in Y-pod, Drummond had her cycle five or six times.

Plaintiff testified that she takes amitriptylene and it makes her groggy.   Plaintiff indicated that

one night she got up to use the restroom and when she sat down there was a thick clot of blood

on the toilet seat.  Plaintiff testified that if she had an open wound, she would have contracted

AIDS.

Plaintiff testified that she believed Sheriff Helder should be held liable for failing to

follow the detainee hygiene policy.  She did not know if Sheriff Helder had personal knowledge

of the problem with Drummond but she knew the Lieutenant was aware of the situation.  Further,

Plaintiff testified she did ask to speak to the Sheriff or someone of higher rank.

***Racial Slurs, Harassment***, ***Threats, Retaliation and Discrimination***

On February 6 or 7, 2014, Plaintiff testified that the inmates were being deloused. They had to get rid of all linens, strip down, and put on delousing shampoo. Another inmate, Ava Griffin, began harassing the Plaintiff yelling at her, arguing with her, and using racial slurs. Plaintiff testified that Griffin said she did not like the Plaintiff and when she got out of jail, there was a special hanging tree waiting for the Plaintiff. Plaintiff testified that Sergeant Arnold refused to do anything to Griffin.

Plaintiff testified she went to her bunk area and approached Corporal Corken and told her what Griffin had said. Corken's response was for the two of them to just stay away from each other. Plaintiff testified she was complaining to another inmate about the situation and Arnold, who was standing nearby, asked Plaintiff what her problem was. Plaintiff testified that Arnold said that "Nigger" was not a racial term. Plaintiff indicated that Arnold said this five or six times and said she thought of the word as meaning trash.

At that point, another inmate was crying, so Arnold made an announcement that inmates should not pick on the elderly inmate who was "not there mentally." Plaintiff testified she was upset because Arnold, who knew about the threats to the Plaintiff, did not instruct the inmates to quit harassing the Plaintiff.

Plaintiff submitted a grievance on February 6, 2014, dealing in part with Arnold's actions. Specifically, she stated:

> Then Sgt. Arnold said that nigger was only racist when you say it in a racist manner. Shortly after that Sgt. Arnold gave a lecture to the entire pod about Debra Bridges. That she was being picked on by T. Smith. She then called Ms. Smith a b---- and threaten to grab her by her hair and drag her to the hole.

*Defts. Ex.* E at 19.

-8-

Plaintiff testified that a couple of days later, she was called into Lieutenant Cambron's office. Plaintiff testified Cambron did not believe her when she complained about Arnold and told her to get used to the word "Nigger" because it was a "southern thing." Plaintiff testified Cambron told her that she was bullying inmates in the pod. Cambron called in one of Plaintiff's pod mates, Tamra Smith, who refused to speak. Cambron then called Griffin into his office and she said she was the one being threatened and picked on. Griffin was sent back to the pod and Plaintiff and several other inmates were moved to segregation in H-pod. Plaintiff testified she was told it was a pending investigation.

A number of statements were taken from inmates on February 8th. *Court's Ex.* 1.[1] Plaintiff notes that she was not identified as a person involved in bullying other inmates. *Id.*

Plaintiff believed Cambron retaliated against her by putting her in segregation when she had done nothing wrong. Plaintiff testified that she did not volunteer to be moved to H-pod as Cambron says in his affidavit. *Cambron Affidavit* (Doc. 31-16) at ¶ 5.

Plaintiff testified that in the segregation pod, H-pod, you were in one cell, there was only one bathroom, and the doors were locked at night. Plaintiff testified that during the day, once the inmates who were in segregation for punitive reasons had their hour out, the cell doors of the remaining inmates were left unlocked. Plaintiff also believed that Arnold and Cambron retaliated against her by intentionally turning the phones off the first night, leaving Plaintiff unable to communicate with her family. Plaintiff, however, testified that the phones were turned back on the following day.

---

[1] Some of these statements are partially illegible. Court's Exhibit 1 is attached to this report and recommendation.

Plaintiff testified that while she was in segregation, Arnold did not give her toilet paper, sanitary pads, or her medication.  Plaintiff indicated she had PTSD, was claustrophobic, and was having anxiety attacks.  Other inmates, Robin and Tamra, helped her calm down.  Plaintiff testified that after her anxiety attacks, she was told she was not being punished and she could keep her door open for the next few days.  Plaintiff testified that despite this, Arnold's night shift crew closed her door every night.

Plaintiff was in H-pod for three weeks before being moved back to Y-pod.  With the exception of two or three nights a week, the cell door was locked at night.  During the day, the cell was unlocked most of the time.

Plaintiff testified she did tell detention center personnel that she did not feel safe with Griffin in the pod.  Plaintiff testified she submitted a grievance in which she stated that she believed someone from outside the detention center sent Griffin to threaten her because of her charges. Plaintiff testified that four or five days after she was moved to segregation, when she went to get her breakfast, she heard Griffin, who was also in the segregation unit, say: "You're going to burn Nigger."  Griffin was coming down the stairs.  Another inmate got between the two of them.  Plaintiff testified she wrote a grievance saying that she did not feel like she was being protected.  After that, Plaintiff indicated the two were kept separated, with one of them locked up if the other was out.

Plaintiff testified there was one other occasion when she and Griffin were out of their cells at the same time.  Plaintiff went back to her cell and the guards were informed.  Once Griffin returned to her cell, Plaintiff was let back out.  Corporal Donahue came to the pod and had Griffin moved.

-10-

Griffin never physically harmed the Plaintiff.  Plaintiff testified that Griffin belonged to the Aryan Nation, and Plaintiff believed Griffin was trying to provoke her.  Plaintiff testified she was the only African American in the pod.  Plaintiff stated that Griffin made it clear to the guards that she wanted to hurt the Plaintiff.

Plaintiff testified that she believed all Defendants, other than Sheriff Helder, discriminated against her.  If she had been Caucasian, Plaintiff believes Griffin would have been moved out of the pod, Plaintiff would have been provided with the necessary paper work to file criminal charges, and she would have been able to talk to a supervisor.

Plaintiff testified that she felt Arnold discriminated against her by using the word "Nigger" several times, by not believing what she said, and by not keeping the situation from escalating.  Plaintiff testified she felt Cambron discriminated against her on the basis of race and sex.

### Excessive Force

Plaintiff testified that in early November of 2013, sometime between the 1st and the 9th, Sergeant Whittington used excessive force against her.  Plaintiff indicated there had been a fight in the pod between two groups of women.  Plaintiff testified that she was not involved in the fight but started having a panic attack.  Plaintiff used the intercom to ask to be moved. When Whittington came into the pod, Plaintiff testified she asked to be moved from the pod.  Plaintiff indicated Whittington replied that she could not just move people and Plaintiff would have to deal with it.  Plaintiff  told Whittington that she would let her lawyer know and that he would have a "field day."

-11-

Whittington then asked Plaintiff to come outside the pod and as Plaintiff walked past her, Whittington grabbed Plaintiff's arm, twisted it behind her back, and pushed up on the elbow, causing the Plaintiff to walk on her tip toes.  Plaintiff indicated that she had not been yelling and had not resisted in anyway.

Plaintiff testified that once they were in the hallway, Whittington said Plaintiff would find out who she was and that she knew people, including, judges.  Plaintiff testified Whittington told her to straighten up or she would take Plaintiff's good time away.

Plaintiff testified that she complained before this incident about her shoulder muscles being stiff as result of sleeping on a thin mat.  Plaintiff testified she suffered a  pulled muscle from Whittington's actions.  Plaintiff stated she  was sore for a few weeks.  Plaintiff submitted a sick call request and was given Aleve.  She took Aleve for a week or two and then switched to Ibuprofen.

Plaintiff testified she submitted a grievance about the incident but did not really get a response.  *See Defts' Ex.* E at 9.  The exhibits indicate Plaintiff submitted her first grievance about the issue on November 6, 2013.  Id.  Plaintiff received a response in which she was told Whittington's version of the events.  Id.

### *Grievances*

Plaintiff testified that Corporal Amanda Jennings, in response to grievances Plaintiff made about being threatened by inmates and her desire to bring criminal charges against them, said that she would close out the grievances and bring Plaintiff a form to file charges. However, Jennings never brought the Plaintiff a form and when Plaintiff submitted grievances, Jennings

-12-

would merely close them out.  Plaintiff testified that she submitted five or six grievances about the threats and wanting to file criminal charges.

At the time, Plaintiff was represented in her criminal case by a public defender.  Plaintiff testified she did not ask her public defender about filing charges and did not ask for changes to be made in the way cases were being prosecuted.  Plaintiff never talked to a prosecutor about filing charges.

Plaintiff testified that Sheriff Helder did nothing about the grievances.  She further testified that he did not supervise his employees.  Given the situation, Plaintiff believes Sheriff Helder should have been notified of the problems.

### 2.  Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial.  <u>See Celotex v. Catrett</u>, 477 U.S. 317, 324 (1986).

### 3.  Discussion

Defendants maintain they are entitled to summary judgment for the following reasons: (1) Plaintiff 's claims against Washington County regarding the mold, bringing the fire alarms up to code, and housing someone with AIDS in the same facility, are barred for failure to exhaust her administrative remedies as required by the Prison Litigation Reform Act (PLRA); (2) even if the claims against Washington County are not barred by the PLRA, Plaintiff has

-13-

presented no proof of an unconstitutional County policy or custom; (3) with respect to the claims against Arnold, Defendants maintain they are insufficient as a matter of law and/or Arnold is entitled to qualified immunity; (4)  with respect to the claims against Cambron, Defendants maintain Plaintiff's claims about her move to H-pod fail because there is no evidence the move was for disciplinary reasons; (5) with respect to Jennings, Defendants argue that:  any claim based on the alleged mishandling of grievances fails as a matter of law; Plaintiff failed to exhaust her administrative grievances; and Jennings is entitled to qualified immunity; and (6) with respect to Sheriff Helder, there is no indication he was personally involved in any of the decisions concerning the Plaintiff, there is nothing but conclusory allegations to suggest any failure to supervise, and Sheriff Helder is entitled to qualified immunity.

   **(A).  Failure to Exhaust**

   The PLRA, 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

   Exhaustion is mandatory.  Porter v. Nussle, 534 U.S. 516, 524-25 (2002).  In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  Id. at 218 (internal quotation marks and citation omitted).  The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to clam, but it is the

-14-

prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Id. "[F]ailure to exhaust available administrative remedies is an affirmative defense, not a matter of subject matter jurisdiction." Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007).

The Supreme Court in Booth v. Churner, 532 U.S. 731, 738-39 (2001), held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." Walker v. Maschner, 270 F.3d 573, 577 (8th Cir. 2001). The exhaustion requirement applies to "all inmate suits about prison life." Porter, 534 U.S. at 532. This is true whether the claims "involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Id.

In Johnson v. Jones, 340 F.3d 624 (8th Cir. 2003), the Court stated that:

> [u]nder the plain language of section 1997e(a), an inmate must exhaust administrative remedies *before* filing suit in federal court. Thus, in considering motions to dismiss for failure to exhaust under section 1997e(a), the district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred. If exhaustion was not completed at the time of filing, dismissal is mandatory.

Id. at 627.

Inmates of the WCDC submit requests or grievances via an electronic touch pad kiosk system. Kiosks are located in the jail pods. The response is also made via the kiosk system. Who responds to a request or grievance depends on the subject matter of the request or grievance submitted. If the request deals with a medical issue, it is forwarded to the medical staff for response. If the request or grievance deals with a non-medical issue, the responding party is usually a lieutenant or sergeant.

-15-

Plaintiff testified she submitted requests/grievances about the mold in November of 2013, April of 2014, and June of 2014.  While Plaintiff filed numerous requests/grievances in November of 2013, *see e.g., Defts' Ex.* E at 6-12, there is no November of 2013 grievance raising the mold issue.  The April 2014 and June of 2014 documents both mention mold and the problems it was creating with her allergies; however, these grievances were submitted after the case was filed on March 12, 2014.  Plaintiff failed to exhaust her administrative remedies as to this claim.  Defendants are entitled to dismissal without prejudice of this claim.

It appears that no grievances were submitted about the Defendants' alleged failure to bring the smoke and fire alarms in the jail up to code prior to the filing of this case.  Defendants are entitled to the dismissal of this claim without prejudice.

Similarly, Plaintiff did not exhaust her administrative remedies with respect to the exposure to an inmate with AIDS.  While she did submit grievances with respect to being housed with an inmate with AIDS, she did not submit the grievances until after she filed this case.  *See e.g, Defts' Ex.* F at 10 & 13.  Defendants are entitled to dismissal of this claim without prejudice.

**(B).  Conditions of Confinement--Pest Control**

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."   County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).

"Because Plaintiff was a pretrial detainee at the time these claims arose, her claims  arise under the Due Process Clause of Fourteenth Amendment rather than the Eighth Amendment."

-16-

Stickley v. Byrd, 703 F.3d 421, 423 (8th Cir. 2013). "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007); see also Christian v. Wagner, 623 F.3d 608, 613 (8th Cir. 2010)(Pretrial detainees are entitled to "at least as great protection as that afforded convicted prisoners under the Eighth Amendment.")(citation omitted); Owens v. Scott County Jail, 328 F.3d 1026, 1027 (8th Cir. 2003)("Due Process Clause of the Fourteenth Amendment imposes analogous duties on jailers to care for detainees.")(internal quotation marks and citation omitted);  Hall v. Dalton, 34 F.3d 648, 650 (8th Cir. 1994)(In this Circuit, the same standards are applied to Eighth Amendment and Fourteenth Amendment claims).

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996);(). Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. Prison conditions claims include threats to an inmate's health and safety.  Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

To state an Eighth Amendment claim the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the prison that created a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 834 (1994). "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'" Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994)(quoting, Wilson v. Sieter, 501 U.S. 294 (1991)).

-17-

The record viewed in the light most favorable to the Plaintiff fails to show the existence of any genuine issues of material fact as to whether Defendants were deliberately indifferent to the pest problems. The summary judgment record establishes that the jail was sprayed for pests on a monthly basis. Moreover, following Plaintiff's grievance regarding the roaches, the pest control company was called that day and either sprayed that day or the following day.

Furthermore, Plaintiff testified that she had no evidence to suggest that Sheriff Helder was personally aware of the pest problem. Instead, she named Sheriff Helder as a Defendant solely because he was in the chain of command. This is insufficient to establish liability. See e.g., Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)(general responsibility for supervising operations of prison is insufficient to establish personal involvement required to support liability).

**(C). Racial Slurs, Harassment, and Failure to Protect**

Clearly, "[v]erbal threats do not constitute a constitutional violation." Martin v. Sargent, 780 F.2d 1334, 1339 (8th Cir. 1985). Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. McDowell v. Jones, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); Martin, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); Black Spotted Horse v. Else, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim). Cf. Burton v. Livingston, 791 F.2d 97,

-18-

100-101 (8th Cir. 1986)(A claim was stated where the prisoner alleged "that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death").

Arnold's and Cambron's use of racially derogatory terms, while deplorable, is insufficient to state a constitutional claim. Plaintiff, however, also contends that they failed to protect her from Griffin.

To prevail on her failure to protect claim, Plaintiff must first prove she was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. "This is an objective requirement to ensure the deprivation is a violation of a constitutional right." Holden v. Hirner, 663 F.3d 336, 341 (8th Cir. 2011)(citation omitted). Second, Plaintiff must "establish the prison officials were deliberately indifferent to inmate health or safety. This is a subjective requirement, mandating the prisoner prove the official both knew of and disregarded an excessive risk to inmate health or safety." Id. (citation and internal quotation marks omitted); see also Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007)("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment").

Here, Plaintiff contends Griffin harassed her; repeatedly used racial slurs; threatened to hang Plaintiff once they got out of jail; and said Plaintiff was going to burn. Plaintiff reported the conduct to Corken, Arnold, and Cambron. Cambron conducted an investigation and Plaintiff was moved to segregation in H-pod. When Griffin again made a racist statement, officers made sure that she and Plaintiff were not out of their cells at the same time. When Plaintiff was moved back to Y-pod, Griffin was no longer in the pod.

-19-

Assuming for the purposes of this motion that the Plaintiff has established that she was incarcerated under conditions posing a substantial risk of serious harm, there is no genuine issue of material fact as to whether the Defendants acted with deliberate indifference to Plaintiff's health and safety.  Defendants took reasonable steps to separate the Plaintiff and Griffin.  See e.g., Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996)(duty to protect inmates from attacks requires that prison officials take reasonable measures to abate substantial risks of serious harm of which they are aware).  While Plaintiff was unhappy with the restrictions imposed on her as a result of being moved to the segregation pod, keeping the cell doors locked is a reasonable response to a risk of attack.  See e.g., Walton v. Dawson, 752 F.3d 1109, 1121 (8th Cir. 2014)(recognizing the validity of keeping cell doors locked as one method of protecting non-violent inmates from violent inmates).

**(D).  Excessive Force**

"Because [Plaintiff] was a pretrial detainee at the time of the alleged violation of [her] constitutional rights, we analyze [her] claim against [Defendants] under the Fourteenth Amendment, rather than the Eighth Amendment." Morris v. Zefferi, 601 F.3d 805, 809 (8th Cir. 2010)(citations omitted).

> The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the use of excessive force that amounts to punishment. Because the Due Process Clause prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not, we ask whether the defendant's  purpose in using force was to injure, punish or discipline the detainee.

Jackson v. Buckman, 756 F.3d 1060, 1067 (8th Cir. 2014)(internal quotation marks and citations omitted).

-20-

"An official's use of force does not amount to punishment in the constitutional sense if it is but an incident of some other legitimate governmental purpose. . . .  The objective indicia relevant to the excessive-force analysis under the Fourth Amendment guide this due-process inquiry."  Jackson, 756 F.3d at1067 (internal quotation marks and citations omitted).  These indicia are: "the need for the application of the force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether [the force] was used for punishment or instead to achieve a legitimate purpose."  Andrews v. Neer, 253 F.3d 1052, 1060-61 & 1061 n.7 (8th Cir. 2001).  The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *Id.*  "But a *de minimus* amount of force is not actionable under the Due Process Clause."  Jackson, 756 F.3d at 1067.

According to Plaintiff's testimony, she was complying with Whittington's order for her to go to the hallway when Whittington grabbed her arm, twisted it behind her back, and pushed up on her elbow enough that it caused Plaintiff to walk on her tip toes.  Plaintiff indicates this aggravated her shoulder causing her to be in pain for several weeks.  *See also Plaintiff's Deposition* (Doc. 31-18) at pg. 11.

In contrast, Whittington states she "only touched [Plaintiff's] arm as a precaution in case she became out of control." *Defts' Ex.* B at 20.   Arnold, in response to a grievance submitted by the Plaintiff, indicated he had watched the video of the incident and that Plaintiff did not comply with Whittington's instruction and was put in an "escorting position." *Defts' Ex.* E at 9.  Arnold did not take action to preserve the video and it was taped over as part of the normal

-21-

course of events.  Clearly, there is an issue of fact that precludes the entry of summary judgment in Whittington's favor.

### (E).  Retaliation

In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."  Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001)(citation omitted); Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990)(same).  "Indeed, the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable."  Id.; see also Dixon v. Brown, 38 F.3d 379, 380 (8th Cir. 1994)("[W]hen retaliatory conduct is involved, there is no independent injury requirement.").

To prevail on her retaliation claim, Plaintiff must demonstrate: (1) that she engaged in protected activity; (2) that the defendants in response took adverse action that would chill a person of ordinary firmness from continuing in the activity; and (3) that her protected activity was the cause of the retaliation.  See Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994)(threat of retaliation is sufficient injury if made in retaliation for inmate's use of prison grievance procedure).

"To avoid summary judgment, Plaintiff must submit affirmative evidence [of] retaliatory motive."  Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (internal quotation marks and citation omitted).  In the context of retaliatory transfer claims, in addition to proving the three other elements of a retaliation claim, *supra*, the prisoner must show that "but for" unconstitutional retaliatory conduct, she would not have been transferred.  Spencer v. Jackson

-22-

County, MO, 738 F.3d 907, 912 (8th Cir. 2013); Goff v. Burton, 7 F.3d 734, 737-38 (8th Cir. 1993).

After she submitted a grievance about Arnold's conduct, Plaintiff maintains she was retaliated against on, or about, February 8, 2014, when Cambron had her moved from Y-pod to H-pod. It is well settled that an inmate "has a First Amendment right to use the grievance procedure at a detention facility." Spencer, 738 F.3d at 913 (citation omitted). Thus, Plaintiff engaged in a protected activity.

Plaintiff maintains the transfer constitutes an adverse action because the conditions in H-pod were more restrictive. Further, she asserts Cambron did not believe her and accused her of bullying inmates in the pod. Plaintiff testified that this was true even though she was not identified as a bully in statements taken from other inmates. Court's Ex. 1.

Plaintiff also contends that Arnold and Cambron turned the phone off in H-pod the first night. The phone was back on the following day.

A transfer, the denial of privileges, or a worsening of an inmate's living conditions may all constitute adverse actions. Spencer v. Jackson, 738 F.3d 907, 911 (8th Cir. 2013). Here, Plaintiff has presented no affirmative evidence of retaliatory motive and nothing in the record gives rise to an inference of retaliation. Plaintiff's transfer, without more, does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising their constitutional rights as required to state a claim.

There is nothing to suggest the phones in the pod were turned off or disabled because the Plaintiff was moved to the pod. Furthermore, the phones were off for less than twenty-four

-23-

hours and no effort was made to curtail Plaintiff's use of the phones once the phones were back on. For the most part, the cell doors were unlocked.

Plaintiff was identified in a report by Corporal Jamie Guthray as one of the inmates creating problems in Y-pod. *Defts' Ex.* A at 5. Plaintiff was only one of three or four inmates transferred to H-pod. The transfer largely eliminated any interaction Plaintiff would have with Griffin.

In short, nothing, other than her conculsory allegations, suggest she would not have been transferred "but for an unconstitutional, retaliatory motive." Goff, 7 F.3d at 738. Defendants are therefore entitled to summary judgment on this claim.

**(F). Grievances**

"Inmates do not have a constitutionally protected right to a grievance procedure. Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." Ashann-Ra v. Commonwealth of Virginia, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted); see also Lombolt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002)(denial of grievances does not state a substantive constitutional claim); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)("no constitutional right was violated by the defendants' failure, if any, to process all of the grievances [Plaintiff] submitted for consideration"); Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); Blagman v. White, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), aff'd, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." Blagman, 112 F. Supp. 2d at 542 (citing Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991)).  A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." Id. (citation omitted).  "[A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless."  Geiger v. Jowers, 404 F.3d 371, 374 (5th Cir. 2005).

Plaintiff has not identified a federal constitutional right that she was deprived of because of the alleged inadequacies in the grievance procedures.  She makes no argument that: she was treated differently from other similarly situated prisoners; her grievances were ignored because of her exercise of his constitutional rights; or her ability to exercise any specific constitutional right was chilled by Defendants' actions.  Defendants are entitled to judgment in their favor on this claim.

**(G).  Discrimination**

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race."  Wolff v. McDonnell, 418 U.S. 539, 556 (1974)(citation omitted).  Only *deliberate* discrimination is actionable under the Equal Protection Clause.  Personnel Administrator v. Feeney, 442 U.S. 256 (1979); Washington v. Davis, 426 U.S. 229, 239- 48 (1976).  Thus, a claim of racial discrimination under the Equal Protection Clause requires a showing of discriminatory intent. Washington, 426 U.S. at 239-40.

Here, there is no genuine issue of fact as to whether any of the named defendants intentionally discriminated against the Plaintiff.  While there is some disagreement as to what

-25-

actually occurred between the Plaintiff, Arnold, and Cambron, the Plaintiff relies heavily on their alleged use of racial slurs to support her discrimination claim.  Such statements can be subject to varying interpretations.  Inmates of Nebraska penal and Correctional Complex, 567 F.2d 1368, 1381 (8th Cir. 1977).  This is particularly true of Cambron who did not direct the racial slur at the Plaintiff but merely stated that it was a "southern thing" and Plaintiff should get used to it.  Other than the use of racially derogatory terms by other inmates, including Griffin, there is no suggestion that the use of racial slurs was pervasive or severe.  Certainly, the use of racially derogatory language is not to be condoned and is unprofessional and reprehensible; however, the use of such language does not equate to intentional race discrimination.  See e.g., Blades v. Schuetzle, 302 F.3d 801, 805 (8th Cir. 2002)(guard ridiculed the color of the inmate's plans and told him to smile so that he would be seen in the dark--"Though these words are thoroughly offensive, and it is particularly reprehensible for a government official to utter them in the course of his official duties, we believe that the use of racially derogatory language, unless it is pervasive or severe enough to amount to racial harassment, will not by itself violate the fourteenth amendment");  Burton v. Livingston, 791 F.2d 97, 101 n.1 (8th Cir. 1986)(an allegation that a prison guard used racially offensive language in dealing with a prisoner does not, by itself, state a claim under the Equal Protection Clause); see also DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000)(use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution); Williams v. Bramer, 180 F.3d 699, 705-06 (5th Cir. 1999)(an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, did not amount to an equal protection violation).

-26-

Other than the Plaintiff's conclusory allegations, there is no indication at all that the fact that Plaintiff is African American had any impact or effect on the Defendants' actions.  In short, there is nothing from which an inference of discrimination can be drawn.

**(H).  Official Capacity Claims**

With respect to the official capacity claims, they are "functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010).   In other words, the official capacity claims are treated as claims against Washington County.  See Murray v. Lene, 595 F.3d 868, 873 (8th Cir. 2010).

To establish Washington County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom  was adopted with "deliberate indifference" to its known or obvious consequences. *Seymour v. City of Des Moines*, 519 F.3d 790, 800 (8th Cir.2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. *Speer v. City of Wynne*, 276 F.3d 980 (8th Cir.2002); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir.1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389-90 (8th Cir.2007).

Id. at 817-18.

To establish the existence of an unconstitutional policy, the Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has

final authority regarding such matters." <u>Mettler v. Whiteledge</u>, 165 F.3d 1197, 1204 (8th Cir. 1999).  Plaintiff has failed to do so.  Her litany of the ways she believes her rights are violated do nothing to show a "deliberate choice of a guiding principle."

In <u>Johnson v. Douglas County Medical Dept</u>., 725 F.3d 825 (8th Cir. 2013), the Court outlined the necessary elements for establishing the existence of an unconstitutional custom.  It stated:

> To establish a claim for "custom" liability, [Plaintiff] must demonstrate:
>
> 1)  The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2)  Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3)  That Plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

<u>Id</u>., 725 F.3d at 828 (citations omitted).

I believe Plaintiff has failed to show the existence of a genuine issue of material fact as to Washington County's liability.  There is simply no evidence that a policy, custom, or practice, of Washington County was the moving force behind a violation of Plaintiff's constitutional rights.

**(I).  Individual Claims against Sheriff Helder**

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  <u>See Monell v. Department of Social Services</u>, 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  <u>White v. Holmes</u>,  21 F.3d 277, 280 (8th Cir. 1994); <u>see also</u>

-28-

Whitson v. Stone County Jail, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability") (internal quotations omitted); Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability"). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007) (quoting Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006)).

There has been no showing that Sheriff Helder was involved in any of the incidents at issue here or in the day-to-day operations of the jail. Plaintiff has not alleged that she spoke directly to the Sheriff regarding any of her grievances or complaints. In fact, Plaintiff states that she was unable to communicate directly with him. Sheriff Helder is entitled to summary judgment on any individual capacity claims.

### 4. Conclusion

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 29) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to the following claims: (1) Plaintiff's claim regarding the smoke alarms, the mold, and insect problems; (2) Plaintiff's claim about racial slurs, harassment, and the failure of Defendants to protect her from Griffin; (3) the retaliation claim; (4) the inadequate grievance

-29-

procedure claim; (5) the discrimination claim; (6) the exposure to AIDS claim; (7) all official capacity claims; and (8) all individual capacity claims against Sheriff Helder.  This dismisses all claims asserted against Sheriff Helder, Sergeant Arnold, Lieutenant Cambron, and Corporal Jennings.

The unexhausted claims regarding the smoke alarms, the mold, and the exposure to AIDS, should be dismissed without prejudice.

The motion (Doc. 29) should be denied with respect to Plaintiff's claim that Sergeant Whittington used excessive force against her.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of May 2015.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-30-